**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-1754
_____

UNITED STATES OF AMERICA

v.

KENNETH R. DOUGLAS,
                   Appellant
_____

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(No. 2-09-cr-00105-009)
District Judge: Hon. David S. Cercone
_____

Argued on March 23, 2016 before Merits Panel
Argued En Banc on October 18, 2017
_____

Before: SMITH, *Chief Judge*, MCKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
VANASKIE, SHWARTZ, KRAUSE, and RESTREPO,
*Circuit Judges*

(Opinion Filed: March 15, 2018)

Arnold P. Bernard, Jr. [Argued]
437 Grant Street
Suite 407
Frick Building
Pittsburgh, PA 15219
        Counsel for Appellant


Michael L. Ivory [Argued]
Rebecca R. Haywood
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
        Counsel for Appellee

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

When Congress created the Federal Sentencing Guidelines system, its purpose was to increase uniformity by establishing consistency between the actual conduct defendants committed and the sentences courts imposed. Although the Guidelines are now advisory, the goal remains the same: to channel sentencing discretion in order to produce consistent, disciplined decisions and avoid excessive sentencing disparities. The realization of this purpose requires

principled application of the Guidelines. The system works only if courts interpret the Guidelines in a manner faithful to the text the Sentencing Commission has promulgated.

In this case, we are charged with examining whether our interpretation of a particular Sentencing Guideline has comported with the Guideline's text and advanced the system's purpose. Under Guideline § 3B1.3, courts are to impose a two-level enhancement "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The commentary to § 3B1.3 in turn defines "position of public or private trust" as one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. After Kenneth Douglas was convicted of conspiracy to distribute cocaine and conspiracy to engage in money laundering, the District Court in this case imposed the § 3B1.3 enhancement, reasoning that Douglas had abused the special access granted to him by virtue of his position as an airline mechanic at the San Francisco International Airport. We, however, conclude that Douglas is not subject to the enhancement. In so doing, we clarify our approach to cases involving § 3B1.3 and reiterate that the Guideline requires courts to first determine whether a defendant's position was characterized by "professional or managerial discretion" before asking whether he abused the position to facilitate his crime. Because Douglas's position as an airline mechanic did not involve the requisite "professional or managerial discretion," the enhancement does not apply in his case. We will remand to the District Court for resentencing.

## I. BACKGROUND

Sometime in 2008, Douglas approached his friend, Tywan Staples, and asked him if he had a way for Douglas to make some extra money. Douglas and Staples had first met in 1991, when they both worked at the Oakland International Airport Maintenance Base. By 2008, both men were working aircraft maintenance for United Airlines at the San Francisco International Airport. Staples worked at the airport's maintenance base, and Douglas served as a mechanic at the terminal.

Staples knew of a potential way for Douglas to earn additional money. For years, Staples and his cousin, Robert Russell Spence, had been operating a drug distribution scheme that transported cocaine from the Bay Area to Pittsburgh. At first, Staples used the U.S. Postal Service and common carriers to ship cocaine to Spence in Pittsburgh, and Spence shipped the proceeds from the subsequent drug sales back to California. But after law enforcement intercepted two packages in 2007, the conspiracy began to transport the drugs and money using couriers on commercial airline flights in and out of Oakland International Airport.

This new system soon ran into trouble as well. In February 2008, a shipment of nineteen kilograms of cocaine was lost during a layover in Las Vegas. The following month, police seized from couriers two packages containing a total of $235,360.

With these recent setbacks fresh in his mind, Staples thought it might be wise to begin using the San Francisco airport as the base of operations. So he asked Douglas if he

was able to get bags through the San Francisco airport without being searched. Douglas responded that he was. Douglas in fact had an Airport Operation Authority ("AOA") badge, which allowed him to access the terminal without going through a Transportation Security Administration ("TSA") checkpoint. To enter the terminal, Douglas swiped his badge through a card reader and placed his palm and fingers on a biometric hand pad. After the reader approved his badge and all five fingers matched up with his identity from the badge, the door to the terminal would unlock. On a random basis, the TSA would search employees entering the terminal through these secured employee entrances, but generally, Douglas was able to enter the terminal without being screened.

Staples did not have similar access to the terminal at the San Francisco airport, so he knew Douglas would be a significant addition to the conspiracy. Staples offered to pay Douglas to smuggle cocaine into the terminal. Douglas agreed to do so.

Staples and Douglas subsequently developed a straightforward arrangement. Typically, Staples would deliver between ten and thirteen kilograms of cocaine to Douglas's house in a sports bag filled with clothing. Douglas would subsequently take the bag to the airport and enter through the secured employee entrance to the terminal. Inside the terminal, Douglas would sit down next to the courier and place the bag on the ground between them. Douglas would then leave, and the courier would take the bag and continue onto an eastbound flight. Staples later testified that Douglas smuggled cocaine into the terminal this way roughly forty to fifty times. On some of those occasions, Douglas also served as the courier, taking the drugs to Pittsburgh himself. Each time Douglas got the

cocaine into the airport, he was paid $5,000. He earned an additional $5,000 when he flew with the drugs to Pittsburgh.

Relying on airline records, the Government eventually identified forty-six flights departing from the San Francisco airport that were involved with the drug scheme. Douglas was a passenger on seventeen of those flights, sometimes using employee benefit tickets. In several instances, Douglas returned to San Francisco between twelve and twenty-four hours after his original departure flight, spending mere hours at the other destination. The timing of Douglas's flights also coincided with the timing of telephone calls with Staples and deposits into Douglas's bank account.

A grand jury ultimately returned an indictment against Douglas and twenty-one co-defendants. Douglas was charged with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h). After a bench trial, Douglas was convicted on both counts.

Prior to sentencing, the Probation Office submitted a pre-sentence investigation report ("PSR") that recommended Douglas be held responsible for 450 kilograms of cocaine, resulting in a base offense level of 38. The PSR then called for three two-level enhancements for (1) money laundering in violation of 18 U.S.C. § 1956, pursuant to U.S.S.G. § 2S1.1(b)(2)(B); (2) abuse of a position of public or private trust, pursuant to U.S.S.G. § 3B1.3; and (3) obstruction of justice, pursuant to U.S.S.G. § 3C1.1. The PSR explained that the enhancement for abuse of a position of trust applied because Douglas had taken advantage of his security clearance

and employment as an airline mechanic to smuggle drugs into the airport.

Douglas objected to the calculation of the amount of drugs and the enhancements for abuse of a position of public or private trust and obstruction of justice. The District Court, however, overruled those objections at sentencing. It concluded that Douglas used his "position of trust with the airlines" and his security clearance to aid him in his role in the conspiracy. App. 411. The District Court concluded that Douglas' total offense level was 43, which is the maximum under the Guidelines and corresponds to a sentence of life imprisonment. The District Court ultimately decided to vary downward from the Guidelines recommendation and imposed a sentence of 240 months.

On appeal, a Panel of this Court affirmed Douglas's sentence with respect to the drug quantity calculation and the enhancement for abuse of a position of public or private trust, but it reversed the obstruction of justice enhancement. The full Court subsequently granted Douglas's petition for rehearing en banc solely on the issue of whether he was subject to the enhancement for abuse of a position of trust.[1]

_____

[1] The order granting rehearing en banc vacated the original panel opinion in its entirety, but the full Court did not rehear the drug quantity calculation or obstruction of justice enhancement issues. The Panel has issued a new opinion that reinstates the original Panel opinion except for the issue addressed here. That new Panel opinion is filed contemporaneously with this en banc opinion. *See United States v. Douglas*, No. 15-1754, --- F.3d --- (3d Cir. ____).

## II. JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). Whether a defendant occupied a position of public or private trust for purposes of U.S.S.G. § 3B1.3 is a legal question over which we exercise plenary review. *United States v. DeMuro*, 677 F.3d 550, 567 (3d Cir. 2012). If we determine the defendant held such a position, we review for clear error whether he abused the position. *Id.*

## III. DISCUSSION

In relevant part, U.S.S.G. § 3B1.3 states: "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." Application Note 1 to the Guideline adds that a "position of public or private trust" is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1. Note 1 also provides three examples of when the two-level enhancement would apply: "the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, [and] the criminal sexual abuse of a patient by a physician under the guise of an examination." *Id.* The Note further states that the enhancement would "not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." *Id.*

8

Application Note 2 to the Guideline likewise reinforces the requirement of discretionary judgment by identifying two exceptions when the enhancement would apply even in the absence of such judgment: cases in which a postal worker "engages in the theft or destruction of undelivered United States mail," and cases in which a defendant abuses "the authority of his or her position in order to obtain, transfer, or issue unlawfully, or without authority, any means of identification," as when a hospital orderly misappropriates information from a patient's chart. *Id.* cmt. n.2.

## A.    The Shortcomings of Our Approach to Cases Involving the § 3B1.3 Enhancement

In determining whether a defendant is subject to the § 3B1.3 enhancement for abuse of a position of public or private trust, our precedent calls for a two-part inquiry. First, we must determine whether the defendant actually occupied a position of public or private trust. *E.g.*, *United States v. Iannone*, 184 F.3d 214, 222 (3d Cir. 1999). Second, if we conclude that the defendant did hold such a position, then we "must determine whether the defendant abused this position in a manner that significantly facilitated his crime." *Id.* Separately, we have held that, when determining at step one whether the defendant occupied a position of public or private trust, courts are to "consider: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994).

9

For the last two decades, we have followed this approach in a number of cases, most of which have involved instances where the defendant had been convicted of some kind of fraud. *See, e.g.*, *United States v. Kennedy*, 554 F.3d 415, 425 (3d Cir. 2009); *United States v. Thomas*, 315 F.3d 190, 204–05 (3d Cir. 2002), *abrogated on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014); *United States v. Sokolow*, 91 F.3d 396, 412–13 (3d Cir. 1996).

Our application of this framework has not been entirely uncontroversial, however. In 1999, in his concurrence in *Iannone*, then-Chief Judge Becker discussed two related problems with our focus on the three factors we identified in *Pardo*. First, according to him, the *Pardo* factors were "better at detecting abuses of trust . . . than defining a true 'position' of trust." *Iannone*, 184 F.3d at 233 (Becker, C.J., concurring). In other words, Chief Judge Becker wrote, "the use of the [*Pardo*] tripartite test dilutes the concept of a 'position' of trust, reducing our inquiry in practical terms to whether there was an 'abuse of trust.'" *Id.* at 234. And second, because fraud inherently involves an abuse of trust, the emphasis on the *Pardo* factors meant that the § 3B1.3 enhancement would apply in virtually every fraud case. *Id.* As Chief Judge Becker explained, "[b]ecause fraud normally includes all three factors, our description of abuse of trust works equally well as a description of fraud." *Id.* at 232.

To date, this Court has not acted on Chief Judge Becker's concerns. But upon examination, we find merit in the issues he recognized, and we also see additional problems with the *Pardo* factors' place in our analysis. As a result, we are

10

convinced that our approach to cases involving the § 3B1.3 enhancement now requires refinement.

We come to this conclusion for three reasons.

*First*, our use of the *Pardo* factors has conflated the two distinct parts of the § 3B1.3 inquiry. We have made clear that courts must first determine whether the defendant held a position of trust before examining whether he abused that position in a manner that facilitated the commission or concealment of his crime. *See, e.g.*, *Iannone*, 184 F.3d at 222. The first question directs the court's attention to the defendant's status, and the second focuses on the defendant's conduct.

Yet the *Pardo* factors, while purportedly aimed at resolving the first question, instead speak to the second. They demonstrate how the defendant's position enabled his conduct. The first factor—the freedom to commit a difficult-to-detect wrong—is relevant to whether the defendant was able to "commi[t] or conceal[] . . . the offense," U.S.S.G. § 3B1.3, but it says little about whether he occupied a position of public or private trust in the first place. The second factor leads to the same problem: by asking whether the defendant had authority vis-à-vis the object of the wrongful act, we inevitably end up looking at the nature of the crime committed, rather than first examining the defendant's position. The third factor—whether there has been any reliance on the defendant's integrity—is relevant to the extent it shows that the defendant was unsupervised or given considerable deference. However, factor three leads courts astray when it shifts the focus to the victim's susceptibility or the actions of some third party,

11

because that evidence may have nothing to do with the defendant's position.

Thus, the *Pardo* factors, taken together, "dilute[] the concept of a 'position' of trust, reducing our inquiry in practical terms to whether there was an 'abuse of trust.'" *Iannone*, 184 F.3d at 234 (Becker, C.J., concurring). Section 3B1.3 does not apply to all abuses of trust, however. The clear text of the Guideline states that only defendants who held a *position* of trust are subject to the enhancement.

The *second* reason our approach requires refinement is that our use of the *Pardo* factors is rooted in an outdated version of the commentary to § 3B1.3. Amended Guidelines commentary is binding on federal courts and supersedes prior judicial interpretations of the Guidelines. *See Stinson v. United States*, 508 U.S. 36, 46 (1993); *United States v. Keller*, 666 F.3d 103, 108 (3d Cir. 2011). Relevant here is a 1993 amendment to § 3B1.3, Application Note 1, which added the language referring to "professional or managerial discretion" and "considerable deference," as well as the three examples of positions subject to the enhancement. Prior to the amendment, the Note stated, in its entirety, only that "The position of trust must have contributed in some substantial way to facilitating the crime and not merely provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller." U.S.S.G. § 3B1.3 note (Historical Notes, 1993 Amendments).

In *Pardo*, the Court acknowledged the amendment, but it applied the pre-1993 version of the Note because the conduct at issue had taken place prior to the amendment. 25 F.3d at

12

1190. And the Court developed the three *Pardo* factors based on a "[c]ulling" of pre-1993 case law. *Id.* at 1192. As a result, *Pardo* does not direct courts to the indicia provided in the amended Application Note 1. The ability to commit a difficult-to-detect wrong—which *Pardo* deemed "the primary trait that distinguishes a person in a position of trust from one who is not," 25 F.3d at 1191 (quoting *United States v. Lieberman*, 971 F.2d 989, 993 (3d Cir. 1992))—says nothing about whether the defendant exercised discretion by virtue of his position, much less *professional* or *managerial* discretion. Nor does it speak to whether the defendant's status engendered considerable deference. The significance of the 1993 amendment to Note 1 has led other circuits to conclude that pre-1993 case law is now of little use in determining whether a defendant held a position of trust. *See, e.g.*, *United States v. Reccko*, 151 F.3d 29, 33 (1st Cir. 1998) ("It is true that in dealing with the position-of-trust enhancement courts occasionally have emphasized the employee's freedom to commit wrongs that defy facile detection . . . . But these decisions deal with earlier versions of § 3B1.3 and, thus, antedate the Sentencing Commission's emphasis on managerial or professional discretion." (citation omitted)); *United States v. Jankowski*, 194 F.3d 878, 884 n.5 (8th Cir. 1999) ("[M]uch of the pre-1993 caselaw on section 3B1.3 is not particularly helpful to us."). By using the *Pardo* factors to guide our determination of whether the defendant occupied a position of trust, we have failed to give proper effect to the current version of the commentary and its emphasis on professional or managerial discretion.

Finally, the *third* reason our approach requires refinement is that, in practice, our use of the *Pardo* factors has placed few limits on the scope of the § 3B1.3 enhancement. Because of *Pardo*'s emphasis on the ability to commit a

13

difficult-to-detect wrong and authority vis-à-vis the object of the wrong, mere physical access becomes sufficient. It is therefore difficult to imagine a government employee who would not be subject to the enhancement. The enhancement would seemingly apply, for example, to a custodian at a government office building who stole something off of the desk of another government employee. The custodian would likely have keys to every room in the building—i.e., the authority vis-à-vis the object of the crime—and that access would enable him to bypass security measures and commit a difficult-to-detect wrong. For similar reasons, "ordinary bank teller[s]" would likely qualify for the enhancement under *Pardo* too, if they were not already specifically exempted by Application Note 1. It is evident, however, that the Sentencing Commission did not intend for the enhancement to apply this broadly. Our approach to cases involving § 3B1.3 must distinguish between those positions that are characterized by professional or managerial discretion and those that are not.

## B.    A Refined, Discretion-Focused Approach

Resolving these issues does not require a wholesale abandonment of our approach to cases involving the § 3B1.3 enhancement. We see no reason to alter the basic structure of our two-part inquiry, because the text of § 3B1.3 requires both that the defendant hold a "position of public or private trust" and that he "abuse[]" it "in a manner that significantly facilitated the commission or concealment of the offense."[2]

---

[2] Other circuits have also adopted similar two-part inquiries. *See, e.g.*, *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998); *United States v. Ollison*, 555 F.3d 152, 165–66 (5th Cir. 2009); *United States v. DeMarco*, 784 F.3d 388, 397

A change is required, however, to the way we use the three *Pardo* factors. Accordingly, we will no longer look to those factors when answering the preliminary, status-focused question of whether a defendant held a position of public or private trust. Instead, when determining if the defendant occupied a position of trust, we will ask whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted.[3] In answering this question, we will not consider the context of the crime committed, because, as explained above, the text of the Guideline requires that we first determine whether the defendant held a position that qualifies for the enhancement.

---

(7th Cir. 2015); *United States v. Aubrey*, 800 F.3d 1115, 1134 (9th Cir. 2015); *United States v. Merriman*, 647 F.3d 1002, 1005 (10th Cir. 2011); *United States v. Walker*, 490 F.3d 1282, 1300 (11th Cir. 2007).

[3] Judge Shwartz's dissenting opinion expresses concern over the § 3B1.3 enhancement being limited to situations where a fiduciary relationship existed. It therefore bears emphasis that our definition of a position of trust is disjunctive, and a fiduciary relationship is not required for the enhancement to apply. Nor does our definition encompass only defendants holding professional or managerial titles. Although the defendant's job title may be relevant to the inquiry, it is not dispositive.

The defendant's crime is not relevant to the status-focused inquiry.[4]

In addition to being consistent with the text of the Guideline, this conception of a position of trust also comports with the text of Application Note 1 and its instruction that positions of trust are "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1.

The conception aligns, as well, with the specific examples listed in Application Note 1. The Note states that the enhancement would apply to "an embezzlement of a client's

---

[4] Our conception of a position of trust is similar, though not identical, to that articulated by other circuits. *See, e.g.*, *United States v. Tiojanco*, 286 F.3d 1019, 1021 (7th Cir. 2002) (Positions of trust "involve the type of complex, situation-specific decisionmaking that is given considerable deference precisely because it cannot be dictated entirely by, or monitored against, established protocol."); *United States v. Young*, 266 F.3d 468, 475 (6th Cir. 2001) ("A position of trust is marked by substantial managerial discretion and fiduciary-like responsibilities—a position with supervisory authority and one which engenders considerable deference."). Other circuits have also more broadly emphasized the concepts of discretion, deference, and authority. *See, e.g.*, *Aubrey*, 800 F.3d at 1134; *Reccko*, 151 F.3d at 34.

funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3 cmt. n.1. The first two examples fall into the category of individuals with the power to make decisions free from supervision based on a fiduciary or quasi-fiduciary relationship, while the physician holds an authoritative status such that his or her actions or judgment would be presumptively accepted. Application Note 1 further states that the enhancement would not apply "in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk." *Id.* Neither of those positions fall within the scope of the definition we now adopt.[5]

---

[5] Notwithstanding the problems with our past use of *Pardo*, the approach we now adopt is also largely reconcilable with our post-1993 precedent. Several of those cases involve applying the enhancement to fraud committed by a defendant abusing a fiduciary or quasi-fiduciary relationship. *See, e.g.*, *Kennedy*, 554 F.3d at 417–18, 425; *Thomas*, 315 F.3d at 193–94, 205; *United States v. Hart*, 273 F.3d 363, 377–79 (3d Cir. 2001); *Iannone*, 184 F.3d at 217–19, 225; *United States v. Bennett*, 161 F.3d 171, 174–75, 194–96 (3d Cir. 1998); *Sokolow*, 91 F.3d at 400–01, 413. In three other cases, we found subject to the enhancement defendants in particular positions of authority whose judgment would be presumptively accepted. *See United States v. Babaria*, 775 F.3d 593, 595–98 (3d Cir. 2014) (physician); *United States v. Dullum*, 560 F.3d 133, 135–37, 140–41 & n.5 (3d Cir. 2009) (Secret Service agent who also served in senior leadership position at his church); *United States v. Sherman*, 160 F.3d 967, 969–70 (3d Cir. 1998) (physician).

Only if we find that a defendant occupied a position of trust will we proceed to the second part of the inquiry and ask whether the position significantly facilitated the commission or concealment of the crime. The *Pardo* factors—although not relevant to the position question—are relevant here, because they speak to how the defendant's position enabled his conduct. Thus, in making this determination, courts should consider, among other things, whether the defendant's position allowed him to commit a difficult-to-detect wrong, and the defendant's authority vis-à-vis the object of the wrongful act. Courts may also consider whether the victim relied on the defendant's integrity, such that the victim became a more susceptible target for the defendant.[6] Courts need not find all of the *Pardo* factors satisfied before concluding that the enhancement applies. At the same time, however, courts should not impose the enhancement if the defendant's status provided merely some assistance. The text of the Guideline makes clear that the defendant must abuse his position in a manner that *significantly* facilitated the commission or concealment of the offense.[7]

---

[6] Other factors may be relevant as well; we need not provide an exhaustive list.

[7] Contrary to the assertions of Judge Shwartz's dissenting opinion, we do not hold that courts should disregard "the context in which the defendant's actions took place" when deciding whether to apply the § 3B1.3 enhancement. Dissenting Op. (Shwartz, J.) at 1. This second part of the inquiry in fact *requires* courts to consider the context in which the defendant's actions took place.

## C. Douglas's Case

Turning to the facts of Douglas's case, we conclude that he did not occupy a position of public or private trust for purposes of § 3B1.3. Absent from the record is any evidence that Douglas's job as an airline mechanic for United Airlines falls within either of the categories of positions of trust we have identified. With regard to the first category, we have no reason to believe that Douglas had the power to make decisions substantially free from supervision based on a fiduciary or fiduciary-like obligation to the airline, airport, or public. Douglas was not required to place any third party's interests above his own, nor did he imply that he would do so. Douglas may have had certain privileges within the airport, but if he possessed any decisionmaking authority whatsoever, it is not apparent that it extended to someone or something other than himself. And even if Douglas did possess the requisite decisionmaking authority, the record simply does not show that he exercised it free from supervision.

Similarly, Douglas's position as a mechanic does not qualify as an authoritative status that would lead his actions or

---

At the same time, our holding that the defendant's crime is irrelevant to the initial status-focused inquiry does not mean that the enhancement is limited to situations where the defendant was "task[ed] . . . with preventing the type of wrong that he committed." Dissenting Op. (Shwartz, J.) at 10 n.7. No such nexus is required for the defendant to have abused his position in a manner that significantly facilitated the commission or concealment of the offense.

judgment to be presumptively accepted. The record does not establish that Douglas's job required him to exercise any judgment, much less judgment that others accepted. Indeed, Douglas's position was not the product of particularly unique abilities or experience that would cause others to defer to him, as they ordinarily would a doctor or a police officer. As best we can tell, Douglas was an ordinary line mechanic. Without some evidence that his position was characterized by professional or managerial discretion, we are unable to conclude that the § 3B1.3 enhancement applies.[8]

The Government argues that Douglas is subject to the enhancement because he had been granted a security clearance and an AOA badge, allowing him to move freely through the airport. This may demonstrate that the airline and the TSA trusted Douglas, but it does not show that he held a *position* of trust, as defined by the Guideline. The mere fact that someone trusted the defendant does not satisfy the Guideline's definition. Rather, as we have explained, § 3B1.3 requires professional or managerial discretion. Other courts have therefore termed "position of public or private trust," as used in § 3B1.3, "a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary." *United States v.*

---

[8] This conclusion is consistent with that reached by the First Circuit, which has twice held that airport employees able to bypass security measures do not, by that fact alone, hold positions of trust for purposes of § 3B1.3. *See United States v. Correy*, 570 F.3d 373, 395 (1st Cir. 2009) (airport janitor who helped smuggle drugs); *United States v. Parrilla Román*, 485 F.3d 185, 190–92 (1st Cir. 2007) (airport baggage handlers who helped smuggle drugs).

*Morris*, 286 F.3d 1291, 1299 (11th Cir. 2002) (quoting *United States v. Garrison*, 133 F.3d 831, 839 n.18 (11th Cir. 1998)); *see also United States v. Ragland*, 72 F.3d 500, 502–03 (6th Cir. 1996).

In this case, Douglas "may have occupied a position of trust in the colloquial sense that [he] was trusted not to use [his] access for nefarious purposes," but physical access, on its own, does not amount to professional or managerial discretion. *United States v. Tann*, 532 F.3d 868, 876 (D.C. Cir. 2008).[9] On

---

[9] In arguing that Douglas's unique physical access to the airport should be sufficient to subject him to the § 3B1.3 enhancement, Judge Shwartz's dissenting opinion relies heavily on three cases in which other circuits "applied the . . . enhancement to prison workers who abuse[d] positions that gave them special access to highly secure and regulated locations." Dissenting Op. (Shwartz, J.) at 9–10 (citing *United States v. Gilliam*, 315 F.3d 614, 618 (6th Cir. 2003); *United States v. Brown*, 7 F.3d 1155, 1162 (5th Cir. 1993); and *United States v. Armstrong*, 992 F.2d 171, 172–73 (8th Cir. 1993)). Two of the cases cited, however, involved conduct predating the 1993 amendment to Application Note 1 and therefore contained no discussion of professional or managerial discretion. *See Brown*, 7 F.3d at 1161; *Armstrong*, 992 F.2d at 173–74. The third case involved a defendant who did not actually work in a prison, but instead was an alcohol and drug counselor to individuals on federal probation supervision. *See Gilliam*, 315 F.3d at 616. The application of the enhancement there could not have turned on any special, physical access granted to the defendant, because he in fact possessed no such access.

the contrary, Application Note 2 makes clear that § 3B1.3 applies in only two situations where the defendant did not exercise such discretion and was trusted solely with physical access: theft of mail by postal workers and identity theft. Notably, the Sentencing Commission has not expanded this exception to the general rule beyond those two categories, despite amending the commentary several times since 1993, including most recently in 2009, and despite the heightened security at airports over that timeframe and the corresponding trust inherent in granting physical access to airport employees.[10] Thus, in the absence of further action from the Commission, the Government must show that Douglas possessed more than just the right to be somewhere.

The Government also contends that we can infer Douglas enjoyed a degree of authority and autonomy from the fact he was able to smuggle cocaine into the airport over forty times without being caught. This logic, however, "turns the guideline on its head: it does not follow that, merely because a defendant's position enables him to commit an offense, the position must have been unsupervised and, thus, a position of trust." *United States v. Parrilla Román*, 485 F.3d 185, 191 (1st Cir. 2007). The Government also bears the burden of establishing that the enhancement applies. *United States v. Napolitan*, 762 F.3d 297, 309 (3d Cir. 2014). That burden is

---

[10] The heightened risks associated with physical access to airports and other public facilities are addressed in part by § 5K2.14 of the Guidelines, which provides for an upward departure where "national security, public health, or safety" has been "significantly endangered" by a defendant's conduct. U.S.S.G. § 5K2.14.

not met when the Government simply reiterates evidence of the defendant's ability to commit the underlying crime. Here, the Government has shown only that Douglas's access to the airport terminal helped him commit the offense. It has not demonstrated that Douglas's position at the airport was characterized by professional or managerial discretion.[11] Accordingly, there is no need to proceed to the second part of the inquiry and determine whether Douglas abused his position in a manner that significantly facilitated the commission or concealment of his crime. We hold that he did not occupy a position of public or private trust for purposes of U.S.S.G. § 3B1.3.

## IV. CONCLUSION

For the foregoing reasons, we will reverse the District Court's imposition of the two-level enhancement under U.S.S.G. § 3B1.3, and remand for resentencing.

---

[11] We recognize that we have refined our approach to cases involving § 3B1.3 in this opinion and that the Government did not have the benefit of knowing that approach when it sought the enhancement before the District Court and on appeal. Nonetheless, the Government has had ample opportunity to develop the record fully in this case, and it has not produced *any* evidence showing Douglas's position was characterized by professional or managerial discretion. Under such circumstances, we have no reservations in concluding that the Government has not met its burden of establishing that the enhancement applies.

HARDIMAN, *Circuit Judge*, dissenting.

Because I agree with neither the Majority's conclusion nor the path it took to get there, I must respectfully dissent. I write separately to reiterate my view that we should interpret the United States Sentencing Guidelines (USSG) according to their plain language without adding extra-textual "tests."

Based in part on a two-level enhancement for abuse of a position of trust under § 3B1.3 of the Guidelines, the District Court treated Douglas's offense level as 43 because its initial calculation (44) was so high that it was literally "off the charts." Douglas's crime was so severe that, despite the fact that this was his first offense, the Guidelines suggested a sentence of life imprisonment. Had the District Court disagreed with the Probation Office's recommendation that § 3B1.3 applied to Douglas, his offense level would have been 42, yielding a Guidelines range of 360 months to life.

As the Majority acknowledges, the District Court sentenced Douglas to 240 months in prison, which was a considerable downward variance. Is there any reason to believe that Douglas's sentence would have been different had the District Court denied the enhancement and fixed Douglas's Guidelines range at 360 months to life? I think not. After the initial sentencing proceeding, review by a panel of this Court, consideration of the appeal by the Court sitting en banc, and a second round of sentencing by the District Court, I expect the matter to end up right where it started: with a 240-month sentence. *See, e.g.*, *United States v. Zabielski*, 711 F.3d 381, 388–89 (3d Cir. 2013) (erroneous application of enhancement was harmless where "there [wa]s a high probability that it would have imposed the same sentence irrespective of the . . . enhancement").

Although I am not convinced that the transcript of Douglas's sentencing hearing reflects the same sort of "detailed findings of fact and explanation" that justified our application of the harmless-error doctrine in *Zabielski*, *see id.*, it's hard to imagine why the District Court would, after giving Douglas such a substantial downward variance, conclude on remand that an even greater variance is appropriate simply because Douglas did not exercise professional or managerial discretion. Regardless of whether Douglas was a "fiduciary," a "professional," or a "manager," the fact remains that he had a security clearance that gave him special access to sensitive locations at an international airport, which he abused in order to facilitate large-scale drug trafficking to the great detriment of the public. In my view, this satisfies § 3B1.3.

Although I agree with the result she reaches, I cannot join Judge Shwartz's thoughtful dissent because I do not agree that the factors we established in *United States v. Pardo*, 25 F.3d 1187 (3d Cir. 1994), are worth retaining. Hearing this case en banc gave us an opportunity to scuttle this test, which strays far from the text of § 3B1.3. *Compare* USSG § 3B1.3 (enhancement applies "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense"), *with Pardo*, 25 F.3d at 1192 ("[c]ulling . . . from our cases" the following factors: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position," to be "considered in light of the guiding rationale of the section—to punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity").

In seeking to refine the *Pardo* test, the Majority adds even more extra-textual requirements to what was already an unnecessarily prolix framework. This new iteration divides the § 3B1.3 inquiry into a "preliminary, status-focused question of whether a defendant held a position of public or private trust," which then "ask[s] whether the defendant had the power to make decisions substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2) an authoritative status that would lead his actions or judgment to be presumptively accepted." *Id.* at 14–15. If this new set of prerequisites is satisfied, it is then capped off by a *Pardo* analysis, which requires an examination of how the crime was committed. I recommend we eschew this schema in favor of one relevant question: did the District Court err in concluding that Douglas abused a position of public trust? *See* USSG § 3B1.3.

I agree with the Majority that the Guidelines commentary is entitled to "controlling weight." *Stinson v. United States*, 508 U.S. 36, 45 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). But Judge Shwartz is correct that the relevant application note, which explains that a position of trust is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)," does not foreclose the application of the § 3B1.3 enhancement to Douglas even though he did not exercise the discretion of a "manager" or "professional." Shwartz Dissent at 1 (quoting USSG § 3B1.3 cmt. n.1). The phrase "characterized by," along with the use of "*i.e.*," confirms that such discretion is merely "typical or characteristic of" a position of trust rather than a necessary component. *See Characterize 2*, *Oxford English Dictionary*

3

(2017); *see, e.g.*, *United States v. Thomas*, 315 F.3d 190, 204 (3d Cir. 2002) (applying § 3B1.3 enhancement to a non-manager), *abrogated on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014). In light of his ability to bypass airport security and go "almost everywhere" in and around sensitive areas of the terminal during his overnight shift, App. 140–42, Douglas was hardly an "ordinary bank teller or hotel clerk." USSG § 3B1.3 cmt. n.1.

In sum, I would discard the *Pardo* test and review the District Court's analysis by applying the text of § 3B1.3, as informed by its application notes, without further embellishments. Accordingly, I would affirm the District Court's judgment sentencing Douglas to 240 months' imprisonment, not only because its application of the § 3B1.3 enhancement was legally sound, but also because the absence of that enhancement—which would have yielded an advisory Guidelines range of 360 months to life—should not affect what was already a very substantial downward variance.

Despite the additional discretion the Supreme Court granted to district judges in *United States v. Booker*, 543 U.S. 220 (2005), our sentencing review has become increasingly formalistic: the district court applies an enhancement, the defendant appeals on procedural reasonableness grounds, and this Court spills much ink exploring the finer points of the enhancement instead of evaluating the more meaningful sentencing factors stated in 18 U.S.C. § 3553(a). I fear that we are losing the forest for the trees—and this case is a prime example of the problem. With respect, I dissent.

SHWARTZ, <u>Circuit Judge</u>, dissenting with whom CHAGARES and VANASKIE, <u>Circuit Judges</u>, join.

Our colleagues have concluded that our long-standing test for applying the enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3 set forth in <u>United States v. Pardo</u>, 25 F.3d 1187 (3d Cir. 1994), should be changed and that, in considering whether to apply the enhancement, courts should not take into account the context in which the defendant's actions took place. We disagree. As explained below, the text of the Guideline and its application notes support considering the context of the defendant's actions in determining whether he occupied a position of trust and abused it. The <u>Pardo</u> test, which tracked the Guideline, appropriately allowed sentencing courts to consider context and should not be disturbed.

I

Section 3B1.3 calls for a two-level enhancement of a defendant's sentence "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." The application note to § 3B1.3 states that positions of trust are "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference) . . . [and are occupied by persons who] ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."[1]  § 3B1.3 cmt. n.1.  The use of the

_____

[1] The full note provides:

1

word "characterized" in describing "managerial or professional discretion" demonstrates that the enhancement is not limited to defendants who hold a professional or managerial job title. See, e.g., United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002) (home health aide, who opened the victim's mail and paid bills for her, held a position of trust because "[t]hese tasks clearly invested [the aide] with

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. n.1.

considerable discretion since [the victim] did not monitor [her] closely and appeared to rely on her judgment and integrity"), abrogated on other grounds by Loughrin v. United States, 134 S. Ct. 2384 (2014). Moreover, by using the signal "i.e." (which means "that is," Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/i.e.), the Commission is directing courts to focus on whether the discretion the person has is ordinarily given significant deference and whether the person is ordinarily subject to less supervision. Furthermore, while a defendant who is a fiduciary or who holds fiduciary-like status may qualify for the enhancement, fiduciary status is not required. In fact, in describing when the adjustment applies, the Commission identified, "for example," the following situations: an attorney serving as a guardian who embezzles client funds, a bank executive who perpetrates a fraudulent loan scheme, and a doctor who sexually abuses a patient "under the guise of an examination." U.S.S.G. § 3B1.3 cmt. n.1. By using the words "for example," the Commission informs us that there could be positions to which the enhancement applies where the holder of the position has discretion but is not a fiduciary.[2]

---

[2] Other language in the Guideline and its application notes show that § 3B1.3 is not limited to defendants who are fiduciaries or hold fiduciary-like positions or who hold positions of authority. For instance, Application Note 2, entitled "Application of Adjustment in Certain Circumstances," mentions persons who hold positions that could impact the public at large, namely postal employees who steal or destroy United States mail and individuals who have access to personal identifying information, such as state motor vehicle department employees who are authorized to issue driver's licenses. Neither is a fiduciary and neither holds a

3

Notably absent from the Guidelines and the commentary is guidance concerning the meaning of the phrase "position of public trust." The word "public" has several meanings, including "of or relating to people in general," <u>Merriam-Webster Dictionary</u>, <u>available at</u> https://www.merriam-webster.com/dictionary/public, and the word "trust" in this context refers to "one in which confidence is placed," <u>id.</u>, <u>available at</u> https://www.merriam-webster.com/dictionary/trust. Applying the dictionary definitions, "position of public trust" under § 3B1.3 means a position in which people in general have placed confidence. The public expects those holding such positions to act in the public's interest.[3]

position of authority. Rather, each is an individual who has access to something the public entrusted to them. While this note directs that the enhancement must apply in these situations, it is clear from later application notes that this note is not a limitation. For example, in Application Note 5, the Commission identified "additional illustrations" in which the enhancement applies, such as the union context. This reflects that the application notes provide examples that are not exhaustive.

[3] Section 3B1.3's Application Note 2 provides two examples that fit this definition. Each person described in the note is one in whom the public has placed confidence based upon their access to something valuable, such as an individual's mail, personal identifying information, or a government-issued identification. In addition, these individuals have discretion concerning how they perform their duties within the confines of some regulation, statute, or code of conduct. Such rules and guidelines seek to ensure that these individuals do not misuse the authority they have been given

Case law also recognizes that it is proper to consider the public's expectations of a particular position when evaluating whether the enhancement applies. For example, the public expects a health care provider who submits a claim to Medicare to provide truthful claims for reimbursement from government funds, see, e.g., United States v. Babaria, 775 F.3d 593, 596-97 (3d Cir. 2014), a pharmacy intern to appropriately handle medications, United States v. Agyekum, 846 F.3d 744, 753-54 (4th Cir. 2017), a deputy marshal not to misuse his ability to avoid searches so he can transfer a firearm to a felon, a police officer not to use drug-buy money for his own gain, United States v. Brann, 990 F.2d 98, 103 (3d Cir. 1993), and water district employees not to submit false documents regarding water quality, United States v. Kuhn, 345 F.3d 431, 436-37 (6th Cir. 2003); United States v. White, 270 F.3d 356, 371-73 (6th Cir. 2001). In each instance, the public's expectations of how these individuals should act stem from a code of conduct, ordinances, oaths, regulations, and statutes that govern their conduct given the jobs they hold or the places where they work and inform whether they hold positions of public trust.

The same applies to an individual who works at an airport. Airport security in the United States is run by the Transportation Security Administration (the "TSA"), a government entity created in the aftermath of the September 11

---

and meet what the public expects of them. For the letter carrier, the public expects that the mail entrusted to him or her will be kept safe and delivered to the intended destination. For the DMV employee, the public expects that the employee will neither misuse the personal information to which he has access nor issue a valuable government identification to someone not entitled to it.

terrorist attacks to secure our airports and air travel. <u>Vanderklok v. United States</u>, 868 F.3d 189, 206 (3d Cir. 2017). The TSA addresses security in many ways, including by ensuring that anyone who works at an airport undergoes criminal and intelligence background checks and receives training in airport security.[4]  Only those individuals who receive security clearance and complete the security training are given access to secured areas of the airport.[5]  In addition,

---

[4] <u>See</u> 49 C.F.R. § 1540.205(b), (d) (explaining that the TSA performs an "intelligence-related check" and, if an applicant "meets the security threat assessment standards," then the "TSA serves a Determination of No Security Threat on the applicant"); <u>id.</u> § 1542.213(c) (stating that an "airport operator may not authorize any individual unescorted access to the [Airport Operation Authority] AOA . . . unless that individual has been provided" various forms of training, including in "[s]ecurity responsibilities"); <u>id.</u> § 1544.228(a), (b) (providing that any individual who, among other things, has unescorted access to cargo or performs certain functions related to the transportation of cargo "must successfully complete a security threat assessment").

[5] <u>See</u> 49 C.F.R. § 1540.5 (stating that "Secured Area means a portion of an airport . . . in which certain security measures specified in part 1542 of this chapter are carried out" and that "Security Identification Display Area (SIDA) means a portion of an airport . . . in which security measures specified in this part are carried out"); <u>id.</u> § 1540.105(a) (describing the "security responsibilities" of individuals with AOA access badges including the prohibition from the use of AOA access "in any other manner than that for which [the badge] was issued"); <u>id.</u> § 1542.203(b) (stating that "[e]ach airport operator required to establish an AOA must prevent and detect

6

the TSA checks the identification of and searches all passengers. Areas that were formerly accessible to nontravelers, such as boarding areas, are now off-limits to all but those who have been through security or have security clearance.

Airport security is considered a critical component of national security, and government authorities that grant access to secured areas expect those with access to act with integrity. Furthermore, the public trusts that airport employees will act in accordance with those systems and not use their positions to circumvent security measures to smuggle weapons or other contraband. Indeed, the public cedes its judgment to those who are permitted in secured areas and is vulnerable to those who misuse their security clearance. In this way, airports are unique given the Government's implementation of robust and comprehensive security systems and the public's expectation that those who work at airports will keep them safe. Thus, an airport employee granted a security clearance is reasonably viewed as one who occupies a position of public trust that can be breached by using his or her position to further a crime. See United States v. Higa, 55 F.3d 448, 453 (9th Cir. 1995) (leaving undisturbed the § 3B1.3 enhancement imposed on an airline customer service representative who "used his position with the airline to gain entry into areas where others could not" to smuggle drugs (internal quotation marks omitted)).

---

the unauthorized entry, presence, and movement of individuals and ground vehicles into or within the AOA by," among other things, "[p]rovid[ing] security information . . . to each individual with unescorted access to the AOA"); id. § 1542.205(a)(2) (providing that each area that is regularly used to load and unload cargo must be a SIDA).

7

Due to the critical importance of airport security and the public's trust in those who have clearances, and considering the expansive nature of Douglas's access to secured areas at an international airport, including the planes themselves, we cannot say that the District Court abused its discretion in concluding that Douglas held a position of public trust. While the record does not indicate how closely Douglas was supervised while performing his mechanic duties, it is evident that he was vested with significant discretion. Douglas's receipt of an Airport Operation Authority ("AOA") badge shows that the TSA and airport vested him with discretion to access areas of the airport in ways members of the public and other employees could not. More specifically, Douglas had unfettered and unescorted access to planes, which the Government goes to great lengths to protect by screening every passenger who seeks to board and inspecting each bag placed within. Like the pharmacist with access to controlled substances and the health provider who submits claims for payment from the United States Treasury, Douglas, as an airport employee with security clearance, was governed by a regulatory scheme imposed to protect the public. The public, in turn, relies on people like Douglas not to misuse their special status. In short, the context in which Douglas engaged in his criminal activity and the public's expectations for how someone in his position should behave show that he occupied a position of trust.

Thus, Douglas held a position of trust because (a) national security and public safety concerns in the context in which he worked are paramount, (b) the Government has implemented significant security systems to address those concerns, (c) the public relies upon those security measures and trusts those with security clearances and the authority they

8

have been granted to act in a responsible fashion, and (d) Douglas was vested with authority to access secure locations at the airport.[6]

Concluding that an airport worker like Douglas holds a position of public trust finds support in cases that have held that prison workers hold positions of trust. Both airports and prisons have governmentally-imposed security measures designed to keep the location secure and to protect the public. Prison employees are given authority to enter these secured places, and misuse of this access can pose a risk to public safety. For these reasons, our sister circuits have applied the § 3B1.3 enhancement to prison workers who abuse positions

---

[6] While issues of national security and public safety provide a basis for an upward departure under U.S.S.G. § 5K2.14, that departure provision covers a concern that differs from that addressed by § 3B1.3. Section 5K2.14 permits an upward departure "[i]f national security, public health, or safety was significantly endangered" as a result of the defendant's conduct, regardless of where the conduct took place. Thus, § 5K2.14 focuses on the consequences of the defendant's actions. Section 3B1.3 focuses on the position the defendant held and whether he abused it. Cf. United States v. Kikumura, 918 F.2d 1084, 1118 (3d Cir. 1990) (acknowledging that the upward departures for conduct that endangers the public safety under § 5K2.14 and extreme conduct under § 5K2.8 may overlap but concluding that they address "analytically distinct" concepts, where the national security enhancement addresses the impact of the defendant's dangerous conduct on "safety and welfare of the general public"), overruled on other grounds, United States v. Grier, 449 F.3d 558, 570 (3d Cir. 2006).

that gave them special access to highly secure and regulated locations. See United States v. Gilliam, 315 F.3d 614, 618 (6th Cir. 2003) (drug counselor used his position to engage in drug dealing with prisoners); United States v. Brown, 7 F.3d 1155, 1162 (5th Cir. 1993) (prison food service manager who smuggled prisoners the proceeds of a Postal Service money order scheme); United States v. Armstrong, 992 F.2d 171, 172-73 (8th Cir. 1993) (prison instructor who solicited inmates to manufacture and pass counterfeit bills). This is because "the public places tremendous trust in prison employees that they will not conspire with inmates to violate the law." Gilliam, 315 F.3d at 618 (alteration, citation, and internal quotation marks omitted). Similarly, the layers of security at airports "advance[] the public interest" in national security, United States v. Hartwell, 436 F.3d 174, 179 (3d Cir. 2006); see also Singleton v. C.I.R., 606 F.2d 50, 52 (3d Cir. 1979) (recognizing the government's "compelling reasons" for airport and airline security),[7] and those who misuse their

---

[7] That Douglas's job did not task him with preventing the type of wrong that he committed does not undermine the conclusion that he was able to commit the crime as a result of the position of trust he held. Like the prison employees who were not specifically tasked with preventing contraband from moving through the prisons, Douglas used his unfettered and unescorted access at the airport to surreptitiously move contraband and abuse his position of trust. See Gilliam, 315 F.3d at 618; Brown, 7 F.3d at 1162; Armstrong, 992 F.2d at 172-74.

Furthermore, although Douglas was a mechanic, this does not mean that he did not hold a position of public trust. It is undeniable that he held a position of trust insofar as he was given access to aircraft engines and the public would trust him

10

secured access undermine that interest and violate the public trust.

For these reasons, the context in which Douglas committed his crime shows that he did so by abusing a position of public trust and he is subject to the enhancement.

II

Aside from forbidding sentencing judges from considering context, the Majority chose to modify our decades-old test, known as the Pardo test or Pardo factors, for applying the enhancement. No party requested a rejection or even modification of Pardo, the Pardo test has not resulted in either an overuse or misuse of the enhancement, and most importantly, the test comports with the Sentencing Guidelines. Thus, no modification of Pardo is required.

---

not to use his position to tamper with the engines. To limit the enhancement to situations only where the crime is at the heartland of his job duties as a mechanic, however, would enable him to avoid the enhancement where, for example, he entered a secured area and committed a different crime, such as slashing the plane's tires. In short, the applicability of the enhancement should be context-specific, rather job-specific.

Moreover, the fact he may not hold a position of authority does not mean that he does not hold a position of trust. A night watchman at a nuclear facility, who supervises no one, surely holds a position of trust because he is vested with tremendous responsibility to keep the facility secure to protect the public.

Pursuant to <u>Pardo</u>,

> the inquiry into whether a defendant was appropriately subject to a § 3B1.3 enhancement is twofold. First, the court must determine whether a defendant was placed in a position of trust, and, if he was, it must then determine whether he abused that position in a way that significantly facilitated his crime.
>
> In determining whether a position of trust exists, we consider three factors: (1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority to which the position vests in defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

<u>Babaria</u>, 775 F.3d at 596 (citations and internal quotation marks omitted). The Majority says that the <u>Pardo</u> test does not address whether a defendant holds a position of trust and does not track the components of § 3B1.3—discretion, deference, and supervision. We disagree. <u>Pardo</u>'s consideration of authority and the freedom to commit a difficult-to-detect wrong speaks to discretion and the presence or absence of supervision. <u>Pardo</u>'s consideration of whether a person's integrity is relied on speaks to whether his judgment is worthy of deference.

Moreover, the <u>Pardo</u> test ensures that sentencing courts apply the enhancement by considering the context within which the defendant acted and the expectations of those who

12

reposed trust in him.  Under the Pardo test, neither titles nor job descriptions dictate whether the person held a position of trust.  Rather, Pardo provides factors for applying the enhancement, mindful that the purpose of the enhancement is to "punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity."  Pardo, 25 F.3d at 1192; see also United States v. DeMuro, 677 F.3d 550, 567-68 (3d Cir. 2012).  By barring consideration of context (which the Pardo factors appropriately considered), the Majority has narrowed the circumstances when the text of the Guidelines and application notes would plainly support applying the enhancement.  Particularly in the context of public trust, whether that person abuses his position of public trust requires consideration of context-specific matters such as the nature of the relationship between the defendant and the public and the public's expectations for someone who holds a position like the defendant, regardless of his job title or actual duties.

Considering the context and the relationship between Douglas's authority and the public's expectations, which include the fact that Douglas worked at an international airport subject to TSA regulations that gave him unfettered access to secured areas, his position provided him the means to "commit a difficult-to-detect wrong" because it permitted him to bypass security measures, which dramatically reduced the likelihood that luggage containing the drugs he was smuggling would be searched.[8]  See Pardo, 25 F.3d at 1192 (emphasis omitted).  He

---

[8] That Douglas could have been subjected to random searches does not alter this conclusion, because Douglas was still trusted to move past security at will without inspection the vast majority of the time, and hence, he was largely deferred to.

13

was vested with discretion in exactly the area that related to "the object of the wrongful act"—he was able to move freely into the terminal without inspection. Id. Finally, it is reasonable to infer that airport leadership and government authorities granted him a security clearance in "reliance on [his] integrity," trusting that he would not abuse it to circumvent airport security. Id. Thus, Douglas held a position of public trust as contemplated under § 3B1.3, which he abused.

## III

Because the Pardo test comports with the Sentencing Guidelines, and because the Majority's test is unduly restrictive in its prohibition against considering the context within which the defendant exercises discretion, and fails to recognize the unique nature of what constitutes a position of public trust and how it can be abused, we respectfully dissent.[9]

---

[9] This case may provide an occasion for the Sentencing Commission to review § 3B1.3. Much has changed since § 3B1.3 was first enacted and even since it was last amended. For instance, when Application Note 1 excluded a bank teller from being subjected to the enhancement, a teller did not have computer access to a customer's entire banking record. Now, like the DMV employee referenced in Application Note 2, a teller has access to and is entrusted with personal identifying and bank information. Similarly, in this era where cyber and national security concerns are paramount, the Commission may wish to consider whether the enhancement should apply to those who hold positions that provide the means to compromise cyber or national security even where their core job duties may not require them to interface with cyber or

---

national security matters.  Finally, the Commission may wish to define the phrase "position of public trust" and provide guidance as to whether the context in which a defendant carried out a crime can be considered in determining whether he holds a position of trust.